**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| QUANTEFI CORP. <br><br> *Plaintiff*, <br><br> vs. <br><br> COMCAST CABLE COMMUNICATIONS, LLC, D/B/A XFINITY, COMCAST CORP., COMCAST CABLE COMMUNICATIONS MANAGEMENT, LLC, AND COMCAST OF HOUSTON, LLC, <br><br> *Defendant*. | CASE NO.  2:26-cv-00376 <br><br><br> **Complaint for Patent Infringement** <br><br> **JURY DEMANDED** |

**COMPLAINT FOR**
**PATENT INFRINGEMENT AGAINST COMCAST**

Plaintiff QuanteFi Corporation ("QuanteFi") files this complaint against Defendants Comcast Cable Communications, LLC, d/b/a Xfinity, Comcast Corp., Comcast Cable Communications Management, LLC, and Comcast of Houston, LLC (collectively, "Comcast" or "Defendants"), alleging infringement of U.S. Patent Nos. 7,656,900 (the "'900 patent"), 9,331,883 (the "'883 patent"), and 11,258,500 (the "'500 patent") (collectively, the "Patents-in-Suit" or "Asserted Patents").

**BACKGROUND**

1.     This complaint arises from Defendants' infringement of the following United States patents owned by QuanteFi, each of which relates to wireless communications technology and standardized wireless functionality: U.S. Patent No. 7,656,900 ("'900 patent"), U.S. Patent No. 9,331,883 ("'883 patent"), and U.S. Patent No. 11,258,500 ("'500 patent") (collectively, the

1

"Asserted Patents").

2.      The infringement allegations in this Complaint are based on standards-driven implementations of 5G NR and IEEE 802.11 wireless technologies, including 5G bandwidth-part operation, Wi-Fi multi-user MIMO operation, Wi-Fi sounding and beamforming, and WLAN channel tracking and off-channel monitoring functionality.

**PLAINTIFF QUANTEFI AND THE PATENTS-IN-SUIT**

3.      Plaintiff QuanteFi Corporation is a corporation organized under the laws of Delaware, with its principal place of business at 603 East Milwaukee Street, Suite 200 Detroit, MI 48202.

4.      QuanteFi is the owner of U.S. Patent No. 7,656,900, titled "Methods and Systems for Adaptive Communication," which issued on February 2, 2010. A copy of the '900 patent is attached to this Complaint as Exhibit 1.

5.      QuanteFi is the owner of U.S. Patent No. 9,331,883, titled "Wireless Home Network Supporting Concurrent Links to Legacy Devices," which issued on May 3, 2016. A copy of the '883 patent is attached to this Complaint as Exhibit 2.

6.      QuanteFi is the owner of U.S. Patent No. 11,258,500, titled "Hybrid Sector Selection and Beamforming," which issued on February 22, 2022. A copy of the '500 patent is attached to this Complaint as Exhibit 3.

**DEFENDANTS AND THE ACCUSED INSTRUMENTALITIES**

7.      Defendant Comcast Cable Communications, LLC is a limited liability company organized and existing under the laws of the State of Delaware, having its principal place of business at One Comcast Center, 1701 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19103. Comcast Cable Communications, LLC may be served through its registered agent Comcast

Capital Corporation, 1201 N. Market Street, Suite 1000, Wilmington, Delaware 19801.

8.     Defendant Comcast Corporation is a Pennsylvania corporation with its principal place of business at One Comcast Center, 1701 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19103. It is registered to do business in the State of Texas and may be served through its registered agent at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

9.     Defendant Comcast Cable Communications Management, LLC is a limited liability company organized and existing under the laws of the State of Delaware, having its principal place of business at One Comcast Center, 1701 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19103. Comcast Cable Communications Management, LLC may be served through its registered agent at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

10.     Defendant Comcast of Houston, LLC is a limited liability company organized and existing under the laws of the State of Delaware, having its principal place of business at One Comcast Center, 1701 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19103. Comcast of Houston, LLC may be served through its registered agent at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

11.     The Accused Instrumentalities include, without limitation: (a) Defendants' 5G network, services, and infrastructure provided through Xfinity Mobile, including 5G-compatible phones, tablets, and related devices and systems that implement 5G NR bandwidth-part functionality; and (b) Defendants' Wi-Fi 6 and Wi-Fi 7 capable gateways, routers, extenders, hotspots, access points, and related WLAN products and services that implement the IEEE 802.11 functionality described below.

## JURISDICTION AND VENUE

12.     This action arises under the patent laws of the United States, Title 35 of the United

States Code.

13. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

14. Venue is proper in this District under 28 U.S.C. §§ 1391(c) and 1400(b).

15. Comcast is subject to this Court's personal jurisdiction consistent with the principles of due process and/or the Texas Long Arm Statute.

16. This Court has general and specific personal jurisdiction over the Defendants under the laws of the State of Texas at least because Comcast has committed acts of infringement within this District giving rise to this action, has a regular and established place of business in this District, and has established minimum contacts with this forum such that the exercise of jurisdiction over Comcast would not offend traditional notions of fair play and substantial justice. Comcast, directly and/or through subsidiaries or intermediaries, conducts its business extensively throughout Texas, by shipping, distributing, offering for sale, selling, and advertising its products and/or services in Texas and the Eastern District of Texas, regularly do business or solicit business, engage in other persistent courses of conduct, and/or derive substantial revenue from products and/or services provided to individuals in Texas, and commit acts of infringement of QuanteFi's patents in this District by, among other things, making, using, importing, offering to sell, and selling products that infringe the asserted patents, including without limitation the Comcast tablets and phones accused of infringement in this case.

17. Comcast, directly and/or through subsidiaries or intermediaries, have purposefully and voluntarily placed one or more products and/or services in the stream of commerce that practice the Asserted Patents with the intention and expectation that they will be purchased and used by consumers in the Eastern District of Texas. These products and/or services have been and

4

continue to be purchased and used in the Eastern District of Texas.

18.     Venue is also proper in this district because Comcast has a regular and established place of business and has committed acts of infringement in this district.

19.     On information and belief, Comcast, directly and/or through subsidiaries or intermediaries, maintains a permanent physical presence within the Eastern District of Texas. On information and belief, Comcast, directly and/or through subsidiaries or intermediaries, maintain an office and/or a structure in at least Collin County and Liberty County, Texas.[1] *See, e.g.*, https://www.houstonpublicmedia.org/articles/news/business/2024/03/25/481597/comcast-expanding-fiber-optic-infrastructure-internet-service-in-northern-outskirts-of-houston-area/  (last accessed August 27, 2025) (stating that Comcast is investing more than $265 million to reach 100,000 potential new customers by end of 2024 including in Liberty county).

20.     Comcast advertises in the Eastern District of Texas, including but not limited to advertising the geographic coverage of the Xfinity networks within this District. *See, e.g.*, https://texas.comcast.com/2025/07/01/xfinity-launches-simple-all-inclusive-internet-plans/  (last accessed August 27, 2025) (stating that "[a]ll plans include a line of Xfinity Mobile at no additional cost for a year."). By way of example and without limitation, Comcast website provides a coverage map that advertises Xfinity current 5G wireless coverage in and around Marshall, Texas.[2]

---

[1] *Touchstream Tech, Inc. v. Comcast Cable Commc'ns, LLC* et al., Case No. 2-23-cv-00692-JRG, Dkt. No. 49 (E.D. Tex., May 2, 2024).
[2] *See, e.g.,* https://www.xfinity.com/mobile/learn/network-coverage



### COUNT 1 – INFRINGEMENT OF THE '900 PATENT

21.     QuanteFi incorporates by reference each of the allegations in the foregoing paragraphs above and further alleges as follows:

22.     On February 2, 2010, the U.S. Patent and Trademark Office issued U.S. Patent No. 7,656,900 titled "Methods and Systems for Adaptive Communication." Ex. 1.

23.     QuanteFi is the owner of the '900 patent with full rights to pursue recovery of royalties and damages for infringement, including full rights to recover past and future damages.

24.     The written description of the '900 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

6

25.     QuanteFi and its predecessors in interest have satisfied the requirements of 35 U.S.C. § 287(a) with respect to the '900 patent in that QuanteFi is unaware of an articles subject to a duty to mark, and QuanteFi is entitled to damages for Defendants' past infringement.

26.     On information and belief, Defendant makes, uses, imports, offers for sale, and sells certain infringing products in the United States. The Accused Instrumentalities are, for example, cellular base stations that support 3GPP 5G NR bandwidth-part ("BWP") technology, that directly infringe, literally and/or under the doctrine of equivalents, at least Claim 1 of the '900 Patent.

27.     The Accused Products satisfy all claim limitations of one or more claims of the '900 Patent. On information and belief, the Accused Instrumentalities employ, implement, or utilize materially the same 5G bandwidth-part technology, such that facts material to infringement by one Accused Instrumentality will be material to others.

28.     With respect to 1[pre], the Accused Instrumentalities include "a point-to-multipoint communication system":

**Radio waves and health: 5G**

5G equipment, whether it be mobile devices or base stations, meet the same safety standards as the equipment used in previous networks.

**5G is the latest step in the evolution of mobile communication**

The overall aim of 5G is to provide connectivity everywhere for any kind of device that may benefit from being connected. 5G supports a wide range of new applications and use cases, including smart homes, traffic safety, critical infrastructure, industry processes, very-high-speed media delivery and Internet of Things.

**5G capabilities extend far beyond previous generations**

To meet the demands of the new applications and use cases, the capabilities of 5G extend far beyond previous generations of mobile communication. Examples are very high data rates, very short delay (latency), ultra-high reliability, high energy efficiency and ability to handle many more devices within the same area.

**Radio waves are used for communication in 5G**

Like in previous mobile networks, 5G devices communicate with base stations by transmitting and receiving radio waves, or radio frequency (RF) electromagnetic fields (EMF).

**5G uses a new radio technology and new frequency bands**

5G networks incorporate a new radio technology that meets all the extended capability demands. To increase the capacity of the mobile networks and support very high data rates, 5G extends the range of frequencies used for mobile communication. This includes new spectrum below 6 GHz, as well as spectrum in higher frequency bands up to 40 GHz.

**5G equipment use beamforming to improve performance**

To address the demands of increased performance, 5G base stations use many antennas. Arrays of up to hundreds of small antennas at the base station make it possible to direct the transmission of radio waves to maximize the signals that the connected devices receive. This is called beamforming or massive MIMO. Thanks to this technology the transmitted power can be kept low resulting in radio wave exposure at similar levels as in previous networks, even though the performance is significantly improved.

(https://www.ericsson.com/en/about-us/sustainability-and-corporate-responsibility/responsible-

business/radio-waves-and-

health/5g#:~:text=Radio%20waves%20are%20used%20for,the%20performance%20is%20signif

icantly%20improved)

29.     With respect to claim 1[a], the Accused Instrumentalities include "a first network

node configured to be coupled to a multicarrier communication channel including a plurality of

subcarriers," "wherein the first network node is configured to dynamically alter bandwidth at

which data is transferred," and do so "to account for a change in a characteristic of the

communication channel":

8

## 4.4.2    Resource grid

For each numerology and carrier, a resource grid of $N_{\text{grid},x}^{\text{size},\mu} N_{\text{sc}}^{\text{RB}}$ subcarriers and $N_{\text{symb}}^{\text{subframe},\mu}$ OFDM symbols is defined, starting at common resource block $N_{\text{grid}}^{\text{start},\mu}$ indicated by higher-layer signalling. There is one set of resource grids per transmission direction (uplink or downlink) with the subscript $x$ set to DL and UL for downlink and uplink, respectively. When there is no risk for confusion, the subscript $x$ may be dropped. There is one resource grid for a given antenna port $p$, subcarrier spacing configuration $\mu$, and transmission direction (downlink or uplink).

The carrier bandwidth $N_{\text{grid}}^{\text{size},\mu}$ for subcarrier spacing configuration $\mu$ is given by the higher-layer parameter *carrierBandwidth* in the *SCS-SpecificCarrier* IE. The starting position $N_{\text{grid}}^{\text{start},\mu}$ for subcarrier spacing configuration $\mu$ is given by the higher-layer parameter *offsetToCarrier* in the *SCS-SpecificCarrier* IE.

The frequency location of a subcarrier refers to the center frequency of that subcarrier.

For the downlink, the higher-layer parameter *txDirectCurrentLocation* in the *SCS-SpecificCarrier* IE indicates the location of the transmitter DC subcarrier in the downlink for each of the numerologies configured in the downlink. Values in the range $0 - 3299$ represent the number of the DC subcarrier and the value 3300 indicates that the DC subcarrier is located outside the resource grid.

For the uplink, the higher-layer parameter *txDirectCurrentLocation* in the *UplinkTxDirectCurrentBWP* IE indicates the location of the transmitter DC subcarrier in the uplink for each of the configured bandwidth parts, including whether the DC subcarrier location is offset by 7.5 kHz relative to the center of the indicated subcarrier or not. Values in the range $0 - 3299$ represent the number of the DC subcarrier, the value 3300 indicates that the DC subcarrier is located outside the resource grid, and the value 3301 indicates that the position of the DC subcarrier in the uplink is undetermined.

## 4.4.3    Resource elements

Each element in the resource grid for antenna port $p$ and subcarrier spacing configuration $\mu$ is called a resource element and is uniquely identified by $(k, l)_{p,\mu}$ where $k$ is the index in the frequency domain and $l$ refers to the symbol position in the time domain relative to some reference point. Resource element $(k, l)_{p,\mu}$ corresponds to a physical resource and the complex value $a_{k,l}^{(p,\mu)}$. When there is no risk for confusion, or no particular antenna port or subcarrier spacing is specified, the indices $p$ and $\mu$ may be dropped, resulting in $a_{k,l}^{(p)}$ or $a_{k,l}$.

## 4.4.4    Resource blocks

### 4.4.4.1    General

A resource block is defined as $N_{\text{sc}}^{\text{RB}} = 12$ consecutive subcarriers in the frequency domain.

(TS 38.211 V15.4.0); Page 11

## 4.4.5    Bandwidth part

A bandwidth part is a subset of contiguous common resource blocks defined in subclause 4.4.4.3 for a given numerology $\mu_i$ in bandwidth part $i$ on a given carrier. The starting position $N_{\mathrm{BWP},i}^{\mathrm{start},\mu}$ and the number of resource blocks $N_{\mathrm{BWP},i}^{\mathrm{size},\mu}$ in a bandwidth part shall fulfil $N_{\mathrm{grid},x}^{\mathrm{start},\mu} \leq N_{\mathrm{BWP},i}^{\mathrm{start},\mu} < N_{\mathrm{grid},x}^{\mathrm{start},\mu} + N_{\mathrm{grid},x}^{\mathrm{size},\mu}$ and $N_{\mathrm{grid},x}^{\mathrm{start},\mu} < N_{\mathrm{BWP},i}^{\mathrm{start},\mu} + N_{\mathrm{BWP},i}^{\mathrm{size},\mu} \leq N_{\mathrm{grid},x}^{\mathrm{start},\mu} + N_{\mathrm{grid},x}^{\mathrm{size},\mu}$, respectively. Configuration of a bandwidth part is described in clause 12 of [5, TS 38.213].

A UE can be configured with up to four bandwidth parts in the downlink with a single downlink bandwidth part being active at a given time. The UE is not expected to receive PDSCH, PDCCH, or CSI-RS (except for RRM) outside an active bandwidth part.

A UE can be configured with up to four bandwidth parts in the uplink with a single uplink bandwidth part being active at a given time. If a UE is configured with a supplementary uplink, the UE can in addition be configured with up to four bandwidth parts in the supplementary uplink with a single supplementary uplink bandwidth part being active at a given time. The UE shall not transmit PUSCH or PUCCH outside an active bandwidth part. For an active cell, the UE shall not transmit SRS outside an active bandwidth part.

Unless otherwise noted, the description in this specification applies to each of the bandwidth parts. When there is no risk of confusion, the index $\mu$ may be dropped from $N_{\mathrm{BWP},i}^{\mathrm{start},\mu}$, $N_{\mathrm{BWP},i}^{\mathrm{size},\mu}$, $N_{\mathrm{grid},x}^{\mathrm{start},\mu}$, and $N_{\mathrm{grid},x}^{\mathrm{size},\mu}$.

(TS 38.211 V15.4.0); Page 12

# Bandwidth Parts & Bandwidth Adaptation Basic Concepts

—

As per the definition in TS38.300, with Bandwidth Adaptation (BA), the receive and transmit bandwidth of a UE need not be as large as the bandwidth of the cell and can be adjusted: the width can be ordered to change, e.g. to shrink during period of low activity to save power; the location can be ordered to change, e.g. to allow different services. A subset of the total cell bandwidth of a cell is referred to as a Bandwidth Part (BWP), and BA is achieved by configuring the UE with BWP(s) telling the UE which of the configured BWPs is currently the active one.

## BWP Configuration & Allocation

3GPP TS 38.211 specifies Bandwidth Parts (BWP) as a contiguous set of physical resource blocks, selected from a contiguous subset of the common resource blocks for a given numerology (μ) on a given carrier. And for a single UE configuration, the following rules apply and are depicted by figure 6 (example shown with three bandwidth parts):

- A UE can be configured with up to *four* bandwidth parts in the downlink, with a single downlink bandwidth part being active at one time.
  - The UE is not expected to receive PDSCH (Physical Downlink Data Channel), PDCCH, or CSI-RS (Channel State Information Reference Signal) outside an active bandwidth part.
- The same maximum four bandwidth parts can be configured for a UE in the uplink with a single uplink bandwidth part being active at once.
- If a UE is configured with a supplementary uplink, it can additionally be configured with up to four bandwidth parts in the supplementary uplink, with a single supplementary uplink bandwidth part being active at a given time.
  - The UE shall not transmit PUSCH or PUCCH (Uplink Data and Control Channels) outside an active bandwidth part. For an active cell, the UE shall not transmit SRS (Sounding Reference Signal) outside an active bandwidth part.
- There are, however, exceptions as the UE may need to perform Radio Resource Management (RRM) measurements on the downlink or transmit SRS in the uplink, outside of its active BWP. This is therefore done via measurement gap.

(https://newsletter.mediatek.com/hubfs/mwc/download/bandwidth-part-adaptation.pdf); Pages 5-6

30.     With respect to claim 1[b], the Accused Instrumentalities include a first network node "configured to transfer data during a first time interval over a first set of initial frequencies that are selected from the plurality of subcarriers to provide a first bandwidth," and "to transfer data during a second time interval over a first set of modified frequencies that are selected from the plurality of subcarriers to provide a second bandwidth." The Accused Instrumentalities further satisfy the requirement that "the first set of initial frequencies differ[] from the first set of modified frequencies such that the first and second bandwidths account for the change in the characteristic

11

of                           the                           communication                           channel":

- **Allocation (a):** Supporting reduced UE bandwidth capability is especially helpful for devices with limited RF capability or those not capable of full carrier bandwidth.

- **Allocation (b):** Supporting reduced UE power consumption for intermittent and bursty traffic profiles.

- **Allocation (c):** Supporting two non-contiguous BWP with different numerologies allowing different services multiplexing.

- **Allocation (d):** Supporting non-contiguous spectrum, allowing services to be allocated between different BWPs. This is not yet part of Release 15 and could be added into future releases.

## BWP Configuration & Allocation

Figure 8 represents the different BWPs types available for a UE



Figure 8: Bandwidth Parts Types

(https://newsletter.mediatek.com/hubfs/mwc/download/bandwidth-part-adaptation.pdf); Figure 8;

Page                                                                                          7



Figure 6: Bandwidth Parts (BWP) Concept and Configuration

By definition, Carrier Resource Block (CRB) provides the RB numbering throughout the overall carrier bandwidth from CRB0 to CRB_Max (for example CRB272 in case of 100 MHz in FR1 carrier), while Physical Resource Block (PRB) provides the RB numbering within each BWP.

Point A is a common reference point for resource block grids and is obtained by higher layer parameters – either offsetToPointA or absoluteFrequencyPointA according to 3GPP TS 38.211, and is used as the reference to apply frequency offsets that are signaled by the network to identify the lowest subcarrier of the lowest RB for a designated BWP.

Taking the BWP definition, and the fact that up to four BWP could be configured for a UE, different BWP allocation scenarios are possible and each could better serve certain use cases, as highlighted in figure 7.



Figure 7: Bandwidth Parts Allocations

13

([https://newsletter.mediatek.com/hubfs/mwc/download/bandwidth-part-adaptation.pdf](https://newsletter.mediatek.com/hubfs/mwc/download/bandwidth-part-adaptation.pdf)); Figure 6-7; Page 6-7

- **Allocation (a):** Supporting reduced UE bandwidth capability is especially helpful for devices with limited RF capability or those not capable of full carrier bandwidth.

- **Allocation (b):** Supporting reduced UE power consumption for intermittent and bursty traffic profiles.

- **Allocation (c):** Supporting two non-contiguous BWP with different numerologies allowing different services multiplexing.

- **Allocation (d):** Supporting non-contiguous spectrum, allowing services to be allocated between different BWPs. This is not yet part of Release 15 and could be added into future releases.



## BWP Configuration & Allocation

Figure 8 represents the different BWPs types available for a UE

Figure 8: Bandwidth Parts Types

([https://newsletter.mediatek.com/hubfs/mwc/download/bandwidth-part-adaptation.pdf](https://newsletter.mediatek.com/hubfs/mwc/download/bandwidth-part-adaptation.pdf)); Figure 8; Page 7

31.     Defendants knowingly and intentionally induce and contribute to infringement of the '900 patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, Defendants have had knowledge of or have been willfully blind to the '900 patent and the infringing nature of the Accused Instrumentalities at least because of their historical monitoring of industry standards and through at least the filing and service of this Complaint.

32.     Despite this knowledge, Defendants continue to actively encourage and instruct

their customers to use and integrate the Accused Instrumentalities in ways that directly infringe the '900 patent. Defendants do so knowing and intending that their customers will commit these infringing acts. Defendants also continue to make, use, offer for sale, sell, and/or import the Accused Instrumentalities, despite their knowledge of the '900 patent, thereby specifically intending for and inducing their customers to infringe the '900 patent through the normal and customary use of the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instructions to their customers; and indemnifying patent infringement within the United States.

33.     Defendants have known, or have been willfully blind to the fact, that making, using, offering to sell, and selling the Accused Instrumentalities to their customers, would constitute willful infringement of the '900 patent.

34.     Defendants have induced, and continue to induce, infringement of the '900 patent by actively encouraging others (including customers) to use, offer to sell, sell, and import the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instructions on the use of the Accused Instrumentalities; providing the Accused Instrumentalities to customers; and indemnifying patent infringement within the United States.

35.     QuanteFi has been damaged by Defendants' infringement of the '900 patent and is entitled to damages as provided for in 35 U.S.C. § 284, including reasonable royalty damages.

**COUNT 2 – INFRINGEMENT OF THE '500 PATENT**

36.     QuanteFi incorporates by reference each of the allegations in the foregoing paragraphs as if fully set forth herein and further alleges as follows:

37. On February 22, 2022, the United States Patent and Trademark Office issued U.S. Patent No. 11,258,500, titled "Hybrid Sector Selection and Beamforming." Ex. 2.

38. QuanteFi is the owner of the '500 patent with full rights to pursue recovery of royalties and damages for infringement, including full rights to recover past and future damages.

39. The written description of the '500 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

40. QuanteFi and its predecessors in interest have satisfied the requirements of 35 U.S.C. § 287(a) with respect to the '500 patent in that QuanteFi is unaware of an articles subject to a duty to mark, and QuanteFi is entitled to damages for Defendants' past infringement and QuanteFi is entitled to damages for Defendants' past infringement.

41. On information and belief, Defendant makes, uses, imports, offers for sale, and sells certain infringing products in the United States. The Accused Instrumentalities are, for example, Wi-Fi 6 and later wireless products that support HE sounding with OFDMA Resource Unit ("RU") technology, that directly infringe, literally and/or under the doctrine of equivalents, at least Claim 1 of the 500 Patent.

42. The Accused Products satisfy all claim limitations of one or more claims of the 500 Patent. On information and belief, the Accused Instrumentalities employ, implement, or utilize materially the same HE sounding with OFDMA RU technology, such that facts material to infringement by one Accused Instrumentality will be material to others.

43.    With respect to claim 1[a], the Accused Instrumentalities perform "configuring a pattern of a sounding packet of a first wireless node in a resource space," including "assigning a first plurality of precoders to a first subset of the resource space for a first antenna sector of the first wireless node," and "assigning a second plurality of precoders to a second subset of the resource space for the second antenna sector of the first wireless node":

**26.7 HE sounding operation**

**26.7.1 General**

Transmit beamforming and DL MU-MIMO require knowledge of the channel state to compute a steering matrix that is applied to the transmit signal to optimize reception at one or more receivers. HE STAs use the HE sounding protocol to determine the channel state information. The HE sounding protocol provides explicit feedback mechanisms, defined as HE non-trigger-based (non-TB) sounding and HE trigger-based (TB) sounding, where the HE beamformee measures the channel using a training signal (i.e., an HE sounding NDP) transmitted by the HE beamformer and sends back a transformed estimate of the channel state. The HE beamformer uses this estimate to derive the steering matrix.



**Figure 26-7—Example of HE non-TB sounding**



**Figure 26-8—Example of HE TB sounding**

## 27.3.16 SU-MIMO and DL MU-MIMO beamforming

### 27.3.16.1 General

SU-MIMO and DL MU-MIMO beamforming are techniques used by a STA with multiple antennas (the beamformer) to steer signals using knowledge of the channel to improve throughput. With SU-MIMO



**Figure 27-17—Transmitter block diagram for UL transmission or DL non-MU-MIMO transmission of a Data field with BCC encoding on a 26-, 52-, 106-, or 242-tone RU**



**Figure 9-79—HE NDP Announcement frame format**



**Figure 9-80—STA Info field format in an HE NDP Announcement frame if the AID11 subfield is not 2047**

18

| B0 | | B6 | B7 | | B13 |
|---|---|---|---|---|---|
| | RU Start Index | | | RU End Index | |

Bits:                    7                        7

**Figure 9-81—Partial BW Info subfield format**

The RU Start Index subfield in the Partial BW Info subfield indicates the first 26-tone RU for which the HE beamformer is requesting feedback. The RU End Index subfield of the Partial BW Info subfield indicates the last 26-tone RU for which the HE beamformer is requesting feedback. The value of the RU Start Index subfield is less than or equal to the value of the RU End Index subfield. The RU Start Index subfield and RU

**Table 26-4—Settings for BW, RU Start Index, and RU End Index fields in HE NDP Announcement frame**

| Partial bandwidth supported by HE beamformer | Operating channel width of the HE beamformee (MHz) | Bandwidth of HE NDP Announcement frame | RU Start Index field | RU End Index field |
|---|---|---|---|---|
| No | 20, 40, 80, 160/80+80 | 20 MHz | 0 | 8 |
| Yes | 20, 40, 80, 160/80+80 | | 0–8 | 0–8 |
| No | 40, 80, 160/80+80 | 40 MHz | 0 | 17 |
| Yes | 40, 80, 160/80+80 | | 0–17 | 0–17 |
| No | 80, 160/80+80 | 80 MHz | 0 | 36 |
| Yes | 80, 160/80+80 | | 0–36 | 0–36 |
| No | 160/80+80 | 160 MHz or 80+80 MHz | 0 | 73 |
| Yes | 160/80+80 | | 0–73 | 0–73 |
| NOTE 1—The value of the RU Start Index field is always less than or equal to the value of the RU End Index field. | | | | |
| NOTE 2—Partial BW feedback can be solicited only with an HE TB sounding sequence and cannot be solicited with an HE non-TB sounding sequence. | | | | |

### 27.3.17 HE sounding NDP

The HE sounding NDP is a variant of the HE SU PPDU. The format of an HE sounding NDP is defined in Figure 27-46.



**Figure 27-46—HE sounding NDP format**

### 27.3.11.10 HE-LTF field

The HE-LTF field provides a means for the receiver to estimate the MIMO channel between the set of constellation mapper outputs (or, if STBC is applied, the STBC encoder outputs) and the receive chains. In an HE SU PPDU and HE ER SU PPDU, the transmitter provides training for $N_{STS}$ space-time streams (spatial mapper inputs) used for the transmission of the PSDU. In an HE MU PPDU, the transmitter provides training for $N_{STS,r,total}$ space-time streams used for the transmission of the PSDU(s) in the $r^{th}$ RU. In an HE TB PPDU, the transmitter of user $u$ in the $r^{th}$ RU provides training for $N_{STS,r,u}$ space-time streams used for the transmission of the PSDU. For each subcarrier in the $r^{th}$ RU, the MIMO channel that can be estimated is an $N_{RX} \times N_{STS,r,total}$ matrix. An HE transmission has a preamble that contains HE-LTF symbols, where the data tones of each HE-LTF symbol are multiplied by entries belonging to a matrix $P_{HE\text{-}LTF}$, to enable channel estimation at the receiver. When single stream pilot is used in HE-LTF, the pilot subcarriers of each

### 27.3.6.9 Construction of HE-LTF field

The HE-LTF field is defined in 27.3.11.10 and is constructed as follows:

a) Sequence generation: Generate the HE-LTF sequence in frequency domain over the bandwidth indicated by CH_BANDWIDTH as described in 27.3.11.10. Apply a 3 dB power boost if transmitting an HE ER SU PPDU as described in 27.3.11.10.

b) $A_{HE\text{-}LTF}$ matrix mapping: Apply the $P_{HE\text{-}LTF}$ matrix to the data tones of the HE-LTF sequence, and apply the $R_{HE\text{-}LTF}$ matrix to pilot subcarriers of the HE-LTF sequence, except the UL MU-MIMO transmission not using HE single stream pilot HE-LTF mode as described in 27.3.11.10. There is no pilot mapping for an HE TB feedback NDP.

c) CSD: Apply CSD for each space-time stream and frequency segment as described in 27.3.11.2.2.

d) Spatial mapping: Apply the $Q$ matrix as described in 27.3.11.10.

e) IDFT: Compute the inverse discrete Fourier transform.

f) GI and windowing: Prepend a GI indicated by the TXVECTOR parameter GI_TYPE, and apply windowing as described in 27.3.10.

g) Analog and RF: Upconvert the resulting complex baseband waveform associated with each transmit chain to an RF signal according to the center frequency of the desired channel and transmit. Refer to 27.3.10 and 27.3.11 for details.



**Figure 27-35—Generation of 2x HE-LTF symbols per frequency segment**

(IEEE 802.11-2024); Figures 26-7, 26-8, 27-17, 9-79, 9-80, 9-81, 27-46, 27-35; Table 26-4

44.    With respect to claim 1[b], the Accused Instrumentalities "wirelessly transmit[] the sounding packet with the configured pattern to a second wireless node":

## 26.7 HE sounding operation

### 26.7.1 General

Transmit beamforming and DL MU-MIMO require knowledge of the channel state to compute a steering matrix that is applied to the transmit signal to optimize reception at one or more receivers. HE STAs use the HE sounding protocol to determine the channel state information. The HE sounding protocol provides explicit feedback mechanisms, defined as HE non-trigger-based (non-TB) sounding and HE trigger-based (TB) sounding, where the HE beamformee measures the channel using a training signal (i.e., an HE sounding NDP) transmitted by the HE beamformer and sends back a transformed estimate of the channel state. The HE beamformer uses this estimate to derive the steering matrix.



**Figure 26-7—Example of HE non-TB sounding**



**Figure 26-8—Example of HE TB sounding**



**Figure 27-17—Transmitter block diagram for UL transmission or DL non-MU-MIMO transmission of a Data field with BCC encoding on a 26-, 52-, 106-, or 242-tone RU**



**Figure 9-79—HE NDP Announcement frame format**



**Figure 9-80—STA Info field format in an HE NDP Announcement frame if the AID11 subfield is not 2047**



**Figure 9-81—Partial BW Info subfield format**

**channel:** An instance of use of the wireless medium (WM) for the purpose of passing physical layer (PHY) protocol data units (PDUs) between two or more stations (STAs).

(IEEE 802.11-2024); Figures 26-7, 26-8, 27-17, 9-79, 9-80, 9-81.

45.     With respect to claim 1[c], the Accused Instrumentalities perform "transmitting data packets from the first wireless node to the second wireless node according to one or more transmission parameters that are at least one of received from the second wireless node or determined based on channel state information (CSI) feedback received from the second wireless node, wherein the one or more transmission parameters include at least one of transmit antenna state and a beamforming matrix to send data packets from the first wireless node to the second wireless node":

### 26.7 HE sounding operation

#### 26.7.1 General

Transmit beamforming and DL MU-MIMO require knowledge of the channel state to compute a steering matrix that is applied to the transmit signal to optimize reception at one or more receivers. HE STAs use the HE sounding protocol to determine the channel state information. The HE sounding protocol provides explicit feedback mechanisms, defined as HE non-trigger-based (non-TB) sounding and HE trigger-based (TB) sounding, where the HE beamformee measures the channel using a training signal (i.e., an HE sounding NDP) transmitted by the HE beamformer and sends back a transformed estimate of the channel state. The HE beamformer uses this estimate to derive the steering matrix.

The HE beamformee returns an estimate of the channel state in an HE compressed beamforming/CQI report carried in the HE Compressed Beamforming/CQI Report field. There are three types of HE compressed beamforming/CQI report:
—  SU feedback: The HE Compressed Beamforming/CQI Report field consists of an HE Compressed Beamforming Report field.
—  MU feedback: The HE Compressed Beamforming/CQI Report field consists of an HE Compressed Beamforming Report field and HE MU Exclusive Beamforming Report field.
—  CQI feedback: The HE Compressed Beamforming/CQI Report field consists of an HE CQI Report field.

(IEEE 802.11-2024)

46.    Defendants knowingly and intentionally induce and contribute to infringement of the '500 patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, Defendants have had knowledge of or were willfully blind to the '500 patent and the infringing nature of the Accused Instrumentalities at least because because of their historical monitoring of industry standards and through at least the filing and service of this Complaint.

47.    Despite this knowledge, Defendants continue to actively encourage and instruct their customers to use and integrate the Accused Instrumentalities in ways that directly infringe the '500 patent. Defendants do so knowing and intending that their customers will commit these infringing acts. Defendants also continue to make, use, offer for sale, sell, and/or import the Accused Instrumentalities, despite their knowledge of the '500 patent, thereby specifically intending for and inducing their customers to infringe the '500 patent through the normal and customary use of the Accused Instrumentalities. On information and belief, these acts include

24

providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instructions to their customers; and indemnifying patent infringement within the United States.

48.    Defendants have known, or have been willfully blind to the fact, that making, using, offering to sell, and selling the Accused Instrumentalities to their customers, would constitute willful infringement of the '500 patent.

49.    Defendants have induced, and continue to induce, infringement of the '500 patent by actively encouraging others (including customers) to use, offer to sell, sell, and import the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instruction to customers; providing the Accused Instrumentalities to customers; and indemnifying patent infringement within the United States.

50.    QuanteFi has been damaged by Defendants' infringement of the '500 patent and is entitled to damages as provided for in 35 U.S.C. § 284, including reasonable royalty damages.

## COUNT 3 – INFRINGEMENT OF THE '883 PATENT

51.    QuanteFi incorporates by reference each of the allegations in the foregoing paragraphs above and further alleges as follows:

52.    On May 3, 2016, the U.S. Patent and Trademark Office issued U.S. Patent No. 9,331,883, titled Wireless Home Network Supporting Concurrent Links to Legacy Devices." Ex. 3.

53.    QuanteFi is the owner of the '883 patent with full rights to pursue recovery of royalties and damages for infringement, including full rights to recover past and future damages.

54.    The written description of the '883 patent describes in technical detail each

limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

55.    QuanteFi and its predecessors in interest have satisfied the requirements of 35 U.S.C. § 287(a) with respect to the '883 patent in that QuanteFi is unaware of an articles subject to a duty to mark, and QuanteFi is entitled to damages for Defendants' past infringement.

56.    On information and belief, Defendant makes, uses, imports, offers for sale, and sells certain infringing products in the United States. The Accused Instrumentalities are, for example, Wi-Fi 6 and later wireless access points, gateways, routers, and other wireless networking products that support updated Multi-User MIMO ("MU-MIMO") technology, that directly infringe, literally and/or under the doctrine of equivalents, at least Claim 1 of the 883 Patent.

57.    The Accused Products satisfy all claim limitations of one or more claims of the 883 Patent. On information and belief, the Accused Instrumentalities employ, implement, or utilize materially the same updated MU-MIMO technology, such that facts material to infringement by one Accused Instrumentality will be material to others.

58.    With respect to 1[pre], the Accused Instrumentalities include "A wireless access point (WAP) apparatus having a plurality of antennas and supporting multiple-input multiple-output (MIMO) wireless communications with associated station nodes on a selected one of a plurality of orthogonal frequency division multiplexed (OFDM) communication channels":

### 3. Definitions, acronyms, and abbreviations

### 3.1 Definitions

26

**access point: (AP)** An entity that contains one station (STA) and provides access to the distribution system services, via the wireless medium (WM) for associated STAs. An AP comprises a STA and a distribution system access function (DSAF).

**multiple input, multiple output (MIMO):** A physical layer (PHY) configuration in which the transmitter uses multiple antennas and the receiver might use multiple antennas.

**multi-user multiple input, multiple output:** [MU-MIMO] A technique by which multiple stations (STAs), each with one or more antennas, either simultaneously transmit to a single STA or simultaneously receive from a single STA independent PSDUs over the same subcarriers.

### 27.1.1 Introduction to the HE PHY

Clause 27 specifies the PHY entity for a high-efficiency (HE) orthogonal frequency division multiplexing (OFDM) system. In addition to the requirements in Clause 27, an HE STA shall support transmitting and receiving PPDUs that are compliant with the mandatory requirements of the following PHY specifications:

— Clause 19 and Clause 21 if the HE STA supports an operating channel width greater than or equal to 80 MHz and is operating in the 5 GHz band.
— Clause 19 and Clause 21 transmission and reception on 20 MHz channel width (see 26.17.1) if the HE STA is a 20 MHz-only non-AP HE STA and is operating in the 5 GHz band.
— Clause 19 if the HE STA is operating in the 2.4 GHz band.
— Clause 17 if the HE STA is operating in the 6 GHz band.

For 2.4 GHz band operation, the HE PHY is based on HT PHY defined in Clause 19, which in turn is based on the OFDM PHY defined in Clause 17.

For 5 GHz band operation, the HE PHY is based on the VHT PHY defined in Clause 21, which in turn is based on the HT PHY defined in Clause 19, which in turn is further based on the OFDM PHY defined in Clause 17.

For 6 GHz band operation, the HE PHY is based on the OFDM PHY defined in Clause 17.

The HE PHY extends the maximum number of users supported for DL MU-MIMO transmissions to 8 users per resource unit (RU) and provides support for DL and UL orthogonal frequency division multiple access (OFDMA) as well as for UL MU-MIMO. Both DL and UL MU-MIMO transmissions are supported on portions of the PPDU bandwidth (on resource units greater than or equal to 106 tones). In an MU-MIMO resource unit, there is support for up to 8 users with up to 4 space-time streams per user with the total across all users not exceeding 8 space-time streams.

The HE PHY provides support for 20 MHz, 40 MHz, 80 MHz, and 160 MHz contiguous channel widths and support for 80+80 MHz noncontiguous channel width, depending on the frequency band and capability. For

(IEEE 802.11-2024)

59.    With respect to claim 1[a], the Accused Instrumentalities include "a station grouping module configured to select a group of at least two of the associated station nodes for concurrent MIMO communication links with the WAP":

**27.3.1.1 MU transmission**

The MU transmissions include DL MU transmissions and UL MU transmissions.

DL MU transmission allows an AP to simultaneously transmit information to more than one non-AP STA. For a DL MU transmission, the AP uses the HE MU PPDU format and employs either DL OFDMA or DL MU-MIMO, or a mixture of both. UL MU transmission allows an AP to simultaneously receive information from more than one non-AP STA. UL MU transmissions are preceded by a triggering frame from the AP. The non-AP STAs transmit using the HE TB PPDU format and employ either UL OFDMA or UL MU-MIMO, or a mixture of both.

The HE PHY supports OFDMA transmissions, in both the DL and the UL where different users can occupy different RUs in a PPDU (see 27.3.10). The transmission within an RU in a PPDU may be a single stream to one user, multiple streams spatially multiplexed to one user (SU-MIMO), or multiple streams spatially multiplexed to multiple users (MU-MIMO).

NOTE—The VHT PHY supports only full-bandwidth DL MU-MIMO as described in 21.3.11.

(IEEE 802.11-2024)

60.    With respect to claim 1[b], the Accused Instrumentalities include "a transmit selector configured to determine whether all station nodes in the group support a multi-user (MU) protocol":

| HE Capabilities | As defined in HE Capabilities element | As defined in 9.4.2.247 | Specifies the parameters in the HE Capabilities element that are supported by the STA. The parameter is present if dot11HEOptionImplemented is true; otherwise, it is not present. |
|---|---|---|---|

A non-AP HE STA shall support the following features:

— Reception of an HE MU PPDU consisting of a single RU spanning the entire PPDU bandwidth and utilizing MU-MIMO (DL MU-MIMO). The maximum number of spatial streams per user the non-AP STA can receive in the DL MU-MIMO transmission shall be equal to the minimum of 4 and the maximum number of spatial streams supported for reception of HE SU PPDUs. The non-AP STA shall be able to receive its intended spatial streams in a DL MU-MIMO transmission with a total number of spatial streams across all users of at least 4.

(IEEE 802.11-2024, page 4135)

28

61.    With respect to claim 1[c], the Accused Instrumentalities include "a spatial mapper including an input and an output, configured to precode concurrent transmissions to the selected group at the input using a precode matrix 'Q' which spatially separates the concurrent MIMO transmissions to each station node in the group at the output":

### 27.3.5 Transmitter block diagram

The generation of each field in an HE PPDU uses many of the following blocks:

    a)    pre-FEC PHY padding
    b)    Scrambler
    c)    FEC (BCC or LDPC) encoders
    d)    post-FEC PHY padding
    e)    Stream parser
    f)    Segment parser (for contiguous 160 MHz and noncontiguous 80+80 MHz transmissions)
    g)    BCC interleaver
    h)    Constellation mapper
    i)    DCM tone mapper
    j)    Pilot insertion
    k)    Replication over multiple 20 MHz (for BW > 20 MHz)
    l)    Multiplication by 1st column of $P_{HE\text{-}LTF}$
    m)    LDPC tone mapper
    n)    Segment deparser
    o)    Space time block code (STBC) encoder for one spatial stream
    p)    Cyclic shift diversity (CSD) per STS insertion
    q)    Spatial mapper
    r)    Frequency mapping
    s)    Inverse discrete Fourier transform (IDFT)
    t)    Cyclic shift diversity (CSD) per chain insertion
    u)    Guard interval (GI) insertion
    v)    Windowing

### 27.3.6.11 Construction of the Data field in an HE MU PPDU

### 27.3.6.11.1 General

In an HE MU transmission, the PPDU encoding process is performed independently in an RU on a per user basis up to the input of the spatial mapping block, except that CSD is performed with knowledge of the space-time streams starting index for that user. All user data in an RU is combined and mapped to the transmit chains in the spatial mapping block.

### 27.3.6.11.2 Using BCC

A Data field with BCC encoding is constructed using steps a) to l) in 27.3.6.10.1 and then applying CSD for an HE MU PPDU as described in 27.3.11.2.2.



**Figure 27-19—Transmitter block diagram for DL MU-MIMO transmission of a Data field with BCC encoding on a 106- or 242-tone RU**

### 27.3.6.11.4 Combining to form an HE MU PPDU

The per user data is combined as follows:

a)  Spatial mapping: The $Q$ matrix is applied as described in 27.3.12.14. The combining of all user data of an RU is done in this block.

$Q_k^{(i_{Seg})}$     is the spatial mapping matrix for the subcarrier $k$ in frequency segment $i_{Seg}$. For HE modulated fields, $Q_k^{(i_{Seg})}$ is a matrix with $N_{TX}$ rows and $N_{STS,r,total}$ columns. When beamforming or DL MU-MIMO is applied, $Q_k^{(i_{Seg})}$ is a beamforming or DL MU-MIMO steering matrix that is derived from the TXVECTOR parameter EXPANSION_MAT. The beamforming steering matrices and DL MU-MIMO steering matrices are implementation specific. If the TXVECTOR parameter BEAM_CHANGE is 1 or not present, then for pre-HE modulated fields $Q_k^{(i_{Seg})}$ is a column vector with $N_{TX}$ elements with element $i_{TX}$ being $\exp(-j2\pi k\Delta_{F,\,Pre\text{-}HE}T_{CS}^{i_{TX}})$, where $T_{CS}^{i_{TX}}$ represents the cyclic shift for the transmitter chain whose values are defined in 27.3.11.2.1; otherwise it is identical to the spatial mapping $Q_k^{(i_{Seg})}$ for HE modulated fields.

$Q_{k,u}^{(i_{Seg})}$     is the spatial mapping matrix for user $u$ on subcarrier $k$ in frequency segment $i_{Seg}$. For HE modulated fields, $Q_{k,u}^{(i_{Seg})}$ is a matrix with $N_{TX}$ rows and $N_{STS,r,u}$ columns. For pre-HE modulated fields, $Q_{k,u}^{(i_{Seg})}$ is a column vector with $N_{TX}$ elements with element $i_{TX}$ being $\exp(-j2\pi k\Delta_{F,\,Pre\text{-}HE}T_{CS}^{i_{TX}})$, where $T_{CS}^{i_{TX}}$ represents the cyclic shift for the transmitter chain whose values are defined in 27.3.11.2.1.

(IEEE 802.11-2024); Figure 27-19; Page 4207

62.    With respect to claim 1[d], the Accused Instrumentalities include "an output injector coupled to the output of the spatial mapper and configured to inject preambles for synchronizing timing of the MIMO transmissions at the output of the spatial mapper, responsive to an affirmative determination by the transmit selector":



**Figure 27-23—Timing boundaries for HE PPDU fields if midamble is not present**

### 27.3.11.10 HE-LTF field

The HE-LTF field provides a means for the receiver to estimate the MIMO channel between the set of constellation mapper outputs (or, if STBC is applied, the STBC encoder outputs) and the receive chains. In

The generation of the time domain symbol of a 1x HE-LTF is equivalent to modulating every 4 subcarriers in an OFDM symbol of 12.8 μs excluding GI and then transmitting only the first 1/4 of the OFDM symbol in the time domain, as shown in Figure 27-34.



**Figure 27-34—Generation of 1x HE-LTF symbols per frequency segment**

(IEEE 802.11-2024); Figures 27-23, 27-34

63.    With respect to claim 1[e], the Accused Instrumentalities include "an input injector coupled to the input of the spatial mapper and configured to inject preambles before precoding in the spatial mapper, responsive to a negative determination by the transmit selector, whereby transmission preambles are precoded when at least one station node in the group does not support the MU protocol":

33



**Figure 27-13—Transmitter block diagram for L-SIG, RL-SIG, and HE-SIG-A fields for an HE SU PPDU and HE ER SU PPDU if Beam Change subfield is 1**

Figure 27-17 shows the transmitter blocks for the UL transmission or DL non-MU-MIMO transmission of a Data field with BCC encoding on a 26-, 52-, 106-, or 242-tone RU for a single frequency segment if the number of spatial streams is less than or equal to 4. Figure 27-17 applies to the Data field of an HE MU PPDU that is transmitted on an RU allocated to a single user, the Data field of an HE SU PPDU, and the Data field of an HE TB PPDU (regardless of whether it is spatially multiplexed with other users).

The DCM tone mapper, which is part of the constellation mapper, is applied only if DCM is indicated for the RU. A subset of these transmitter blocks consisting of the constellation mapper and CSD blocks and the blocks to the right of, and including, the spatial mapping block is also used to generate the HE-LTF fields. This is illustrated in Figure 27-32 (in 27.3.11.10). A subset of these transmitter blocks consisting of the constellation mapper and CSD blocks and the blocks to the right of, and including, the spatial and frequency mapping block of Figure 27-17 is also used to generate the HE-STF field. This figure also applies to the Data field with BCC encoding in an HE TB PPDU.



**Figure 27-17—Transmitter block diagram for UL transmission or DL non-MU-MIMO transmission of a Data field with BCC encoding on a 26-, 52-, 106-, or 242-tone RU**

(IEEE 802.11-2024); Figures 27-13, 27-17.

64.    Defendants knowingly and intentionally induce and contribute to infringement of the '883 patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, Defendants have had knowledge of or have been willfully blind to the '883 patent and the infringing nature of the Accused Instrumentalities at least because of their historical monitoring of industry standards and through at least the filing and service of this Complaint.

65.    Despite this knowledge, Defendants continue to actively encourage and instruct

their customers to use and integrate the Accused Instrumentalities in ways that directly infringe the '883 patent. Defendants do so knowing and intending that their customers will commit these infringing acts. Defendants also continue to make, use, offer for sale, sell, and/or import the Accused Instrumentalities, despite their knowledge of the '883 patent, thereby specifically intending for and inducing their customers to infringe the '883 patent through the normal and customary use of the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instructions to their customers; and indemnifying patent infringement within the United States.

66. Defendants have known, or have been willfully blind to the fact, that making, using, offering to sell, and selling the Accused Instrumentalities to their customers, would constitute willful infringement of the '883 patent.

67. Defendants have induced, and continue to induce, infringement of the '883 patent by actively encouraging others (including customers) to use, offer to sell, sell, and import the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instructions to customers; providing the Accused Instrumentalities to customers; and indemnifying patent infringement within the United States.

68. QuanteFi has been damaged by Defendants' infringement of the '883 patent and is entitled to damages as provided for in 35 U.S.C. § 284, including reasonable royalty damages.

## **JURY DEMAND**

69. QuanteFi demands a jury trial pursuant to Federal Rule of Civil Procedure 38.

## RELIEF REQUESTED

QuanteFi prays for the following relief:

A.    A judgment in favor of QuanteFi that Defendants have infringed the Asserted Patents, and that the Asserted Patents are valid and enforceable;

B.    A judgment and order requiring Defendants to pay QuanteFi past and future damages arising out of Defendants' infringement of the Asserted Patents in an amount no less than a reasonable royalty, costs, expenses, and pre- and post-judgment interest for its infringement of the asserted patents, as provided under 35 U.S.C. § 284;

C.    A permanent injunction prohibiting Defendants from further acts of infringement of the Asserted Patents;

D.    A judgment and order requiring Defendants to provide an accounting and to pay supplemental damages to QuanteFi, including, without limitation, pre-judgment and post-judgment interest;

E.    A judgement that Defendants' infringement is willful and enhanced damages and fees as a result of that willfulness under 35 U.S.C. § 284;

F.    A finding that this case is exceptional under 35 U.S.C. § 285, and an award of QuanteFi' reasonable attorney's fees and costs; and

G.    Any and all other relief to which QuanteFi may be entitled.

Dated:   May 6, 2026

Respectfully submitted,

*/s/ Marc Fenster*
Marc Fenster
CA State Bar No. 181067
Email: mfenster@raklaw.com
Reza Mirzaie
CA State Bar No. 246953
Email: rmirzaie@raklaw.com
Paul Kroeger
CA State Bar No. 229074
Email: pkroeger@raklaw.com
Adam Hoffman
CA SBN 218740
Email: ahoffman@raklaw.com
Andrew Weiss
CA SBN 232974
Email: aweiss@raklaw.com
Neil A. Rubin
CA SBN 250761
Email: nrubin@raklaw.com
Christian W. Conkle
CA SBN 306374
Email: cconkle@raklaw.com
Jonathan Ma
CA SBN 312773
Email: jma@raklaw.com
Alexandra F. Easely
TX SBN 24099022
Email: aeasely@raklaw.com
Linjun Xu
CA SBN 307667
Email: lxu@raklaw.com
RUSS AUGUST & KABAT
12424 Wilshire Blvd. 12th Floor
Los Angeles, CA 90025
Telephone: 310-826-7474

**ATTORNEYS FOR PLAINTIFF,
QuanteFi Research LLC**